**IRA RESOURCES, INC., Petitioner,**

v.

**Enrique Juan GRIEGO and Sonya Griego, Respondents.**

No. 05–0469.

Supreme Court of Texas.

April 20, 2007.

**594**

Charles C. Murray, Lisa Powell, Atlas & Hall, L.L.P., McAllen, Richard J. Annen, Todd R. Gabriel, Sparber Rudolph Annen, APLC, San Diego, CA, for petitioner.

James H. Miller, James H. Miller P.C., Houston, Roberto J. Yzaguirre, Jose E. Chapa, Yzaguirre & Chapa, Manuel L. Guerra III, Law Offices of Manuel Guerra, McAllen, for respondents.

PER CURIAM.

In this securities case, IRA Resources, Inc. filed a special appearance challenging personal jurisdiction. The trial court denied it, and the Thirteenth Court of Appeals affirmed—a holding that contradicts a factually similar Fourteenth Court of Appeals decision that IRA Resources was *not* subject to jurisdiction in Texas. *Meader v. IRA Resources, Inc.*, 178 S.W.3d 338 (Tex.App.-Houston [14th Dist.] 2005, no pet.). We conclude that specific jurisdiction does not exist over IRA Resources and remand to the court of appeals for an analysis of general jurisdiction.

In April 2001, Abraham Martinez, a Texas resident and marketing agent for SPA Marketing, LLC, approached respondents Enrique and Sonya Griego (collectively, "Griego") about an investment in "Customer Owned Coin Operated Telephones" through American Telecommunications Company, Inc. ("ATC"). Griego agreed to purchase five such payphones for $5,000 apiece pursuant to a service contract with Alpha TelCom, Inc. ("Alpha"), ATC's parent corporation. Under the contract, Al-

pha would maintain the phones and Griego would receive a guaranteed percentage of revenues.

To fund the investment, Griego rolled an individual retirement account ("IRA") into a self-directed IRA administered by IRA Resources, a California corporation headquartered in San Diego. Griego says Martinez claimed to represent IRA Resources, an assertion the court of appeals rejected. Martinez provided Griego with forms to open the IRA account and execute the rollover, an investment directive to purchase the phones, and an indemnity agreement in favor of IRA Resources. Griego completed the forms and tendered a check for $25,500 payable to IRA Resources and a $50 money order payable to IRA Resources, forwarding these items to IRA Resources in California. IRA Resources retained the $50 money order as an account initiation fee and opened a self-directed IRA for Griego. Griego's check for $25,500 was then deposited in a California bank account for the benefit of self-directed IRA holders. Pursuant to Griego's investment directive, IRA Resources issued a check in the amount of $25,000 payable to ATC to purchase the telephones. IRA Resources acted as the third-party administrator of Griego's self-directed IRA, providing certain record-keeping services such as issuing quarterly investment performance statements and reporting IRA income to the Internal Revenue Service, but it followed its clients' investment directives and provided no investment advice, recommendations, or endorsements.

In June 2001, ATC ceased making payments to the payphone owners. When IRA Resources learned this, it informed ATC that it would halt all account applica-

tions directing investments in ATC until ATC met its obligations to IRA Resources' existing clients.

The investment failed, and in September 2003 Griego sued IRA Resources and others,[1] alleging that (1) Griego's sale and service agreement with ATC and Alpha constituted the illegal sale of an unregistered security in violation of the Texas Securities Act ("TSA"), and (2) IRA Resources participated in this illegal sale by providing the underlying investment mechanism and by aiding and abetting ATC and Alpha in a scheme to defraud investors. See Tex.Rev.Civ. Stat. art. 581–33F(1)–(2).

■ The defendants filed special appearances, arguing that Texas courts could exercise neither specific nor general jurisdiction over them. See Tex.R. Civ. P. 120a. The trial court summarily denied the defendants' special appearances without specifying grounds. The court of appeals reversed and rendered in part, saying every defendant except IRA Resources lacked the minimum contacts necessary for either type of jurisdiction. 161 S.W.3d 248, 258. The court, however, held that specific jurisdiction existed over IRA Resources. Although the court agreed Martinez was not an agent of IRA Resources and said his acts could not be imputed to IRA Resources, it nonetheless concluded (1) IRA Resources purposefully directed its activities to Texas when it agreed to administer Griego's self-directed IRA, knowing that Griego was a Texas resident, and accepted Griego's payment sent from Texas; and (2) Griego's TSA claim arose from and related to those contacts. Id. at 255. The court did not discuss general jurisdiction.[2]

---

1. The other defendants were Eldorado Bank and California Bank & Trust, as successor to Eldorado Bank.

2. We have jurisdiction over this interlocutory appeal because the court of appeals' judgment directly conflicts with a prior decision from another court of appeals, see Tex. Gov't Code

■ The Texas long-arm statute authorizes personal jurisdiction over a nonresident defendant who "does business" in Texas, TEX. CIV. PRAC. & REM.CODE § 17.042(1), but the statute's broad, doing-business language reaches only as far as these federal due-process criteria permit: (1) the defendant must have established minimum contacts with the forum state, and (2) the assertion of jurisdiction must comport with "traditional notions of fair play and substantial justice." *Marchand,* 83 S.W.3d at 795 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex. 1977)).

■ The minimum contacts analysis requires purposeful availment, *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002), which is the "touchstone of jurisdictional due process": "some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005) (emphasis in original) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). Purposeful availment has at least three aspects. *Id.* at 785. First, only the defendant's forum-state contacts matter, not anyone else's. *Id.* Second, the contacts must be purposeful, not merely random, isolated, or fortuitous. *Id.* Third, a nonresident defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction, thus impliedly consenting to its laws. *Id.*

■ "Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction." *Marchand,* 83 S.W.3d at 795. When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 575–76, 2007 WL 623805, *4 (Tex.2007) (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 228 (Tex. 1991)).

■ The first element of purposeful availment is that a defendant can only trigger specific jurisdiction through its own conduct, not the unilateral acts of third parties. Griego falters at this threshold stage and offers no evidence that IRA Resources had any contact with him whatsoever, much less made any misrepresentations. Griego argues that Martinez claimed to represent IRA Resources, but nothing in the record indicates that Martinez was IRA Resources' agent. The record undeniably shows the opposite: IRA Resources, a four-employee California company, has no agents in Texas. Martinez could be an *apparent* agent if IRA Resources either knowingly permitted Martinez to hold himself out as having authority or showed such lack of ordinary care as to clothe Martinez with indicia of authority. *NationsBank, N.A. v. Dilling,* 922 S.W.2d 950, 952–53 (Tex.1996) (per curiam). The record evidence shows neither, and the court of appeals, though it ultimately said "yes" to specific jurisdiction, agreed there was no evidence of apparent agency. IRA Resources allowed ATC, at ATC's request, to refer ATC cus-

§ 22.225(b)(3), (c), which held on virtually identical facts that IRA Resources was *not* subject to suit in Texas, *Meader,* 178 S.W.3d at 350. Whether a court has personal juris-diction over a nonresident defendant is a question of law, which we review *de novo. BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002).

tomers who wanted to buy payphones through self-directed IRAs, but IRA Resources received no remuneration from ATC for these referrals and nothing suggests that IRA Resources had any knowledge of Martinez or of his employer, SPA Marketing. Although Martinez provided forms to Griego to set up the self-directed IRA, and IRA Resources processed them, these forms in and of themselves are no indicia of authority. In any event, the forms, which IRA Resources flatly denied providing Martinez or SPA Marketing, expressly define IRA Resources' role as a mere custodian whose services are "not made in connection with any investment for sale...." The forms, however they ended up in Texas, indicate clearly that IRA Resources stands outside the investment transaction between Griego and ATC/Martinez. Texas law does not presume agency, and the party who alleges it has the burden of proving it. *Buchoz v. Klein*, 143 Tex. 284, 184 S.W.2d 271, 271 (1944). Nothing in this record shows that IRA Resources even had knowledge, much less control, over Martinez or his employer, whose independent actions cannot subject IRA Resources to specific jurisdiction in Texas. Griego's jurisdictional argument fails at the most threshold level.

◼ Griego also falls short at the next step, which requires him to show that IRA Resources' contacts with Texas were purposeful as opposed to random and attenuated. It is true that a nonresident cannot escape a forum state's jurisdiction merely by having no office, employees, or inventory there, *Int'l Shoe*, 326 U.S. at 313–14, 66 S.Ct. 154, so IRA Resources' proof on this point, while relevant and undisputed, is not alone dispositive. It is

also true that targeting marketing efforts in a state to generate business there suffices to justify jurisdiction in disputes arising from that business. *Moki Mac*, 221 S.W.3d at 575–76, 2007 WL 623805, *4; *Michiana*, 168 S.W.3d at 785. But the record shows no such conduct. Here, Martinez provided Griego with forms to open the self-directed IRA, but IRA Resources did not market or solicit in Texas, nor did it send the forms to Texas. More significantly, one of these forms is a Hold–Harmless Agreement, signed by Griego, where he acknowledges that IRA Resources did not solicit him and that he would not fault IRA Resources for following his investment directives. It would be disingenuous for Griego to claim that IRA Resources' liability under the TSA arises from or relates to actions in Texas (Griego's filling-out of the self-directed IRA agreement) and then ignore the substance of that agreement when arguing for personal jurisdiction.[3]

◼ The nature and quality of IRA Resources' contacts with Texas, both before the IRA account was opened and after, are random, isolated, or fortuitous rather than purposeful. As stated above, Griego completed the account forms in Texas, but IRA Resources did not advertise, solicit Griego's investment, or negotiate terms of the contract in Texas. IRA Resources did not send Griego the account set-up forms and, indeed, had never heard of him before receiving his application. Although Griego opened this account with funds sent from Texas, merely contracting with and accepting an account-initiation fee from a Texas resident for services performed in California are insufficient to satisfy the minimum contacts test; a con-

---

**3.** While Griego looks to the contract and account statements as sufficient jurisdictional contacts, there is no assertion that IRA Resources breached the agreement or that the

statements were inaccurate; rather, Griego brings a statutory securities claim. *See* Tex. Rev.Civ. Stat. art. 581–33F(1)–(2).

tract does not alone constitute a sufficient "contact" for due process purposes. *See U–Anchor*, 553 S.W.2d at 763 (stating that "preparation and mailing of checks" from Oklahoma resident to Texas business was insufficient to constitute business activity in Texas); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (saying if the question is whether a contract with a nonresident defendant alone can establish sufficient minimum contacts, "we believe the answer clearly is that it cannot"). And *after* opening Griego's self-directed IRA account, IRA Resources, per the contract, acted only as a passive custodian of Griego's retirement account; Griego was solely responsible for all investment decisions. IRA Resources has four employees who office in San Diego, and it manages the account res in California. Its only Texas contact is mailing quarterly statements to Griego, but this administrative paperwork is a mere incident of IRA Resources' custodial role (not to mention immaterial to Griego's TSA claim). IRA Resources has no bank account or postal box in Texas, and none of its employees has ever traveled to Texas for business. IRA Resources neither instigated nor authorized any significant activity in Texas; all of its actions under the contract occurred in California. IRA Resources' Texas-centered conduct is far less extensive than in other cases where we have deemed contacts "purposeful," such as our recent decision in *Moki Mac*, where we noted a Utah company's advertising in a Texas newspaper, sending marketing materials directly to Texas residents, and maintaining a database of Texans to act as facilitators in generating sales. 221 S.W.3d at 579, 2007 WL 623805, \*7. IRA Resources' contacts are much closer to the facts in *Michiana*, where we held that an Indiana RV outlet negotiating the sale of an RV with a Texas resident over the phone, receiving pay-

ment in Indiana, and shipping the vehicle to Texas per the buyer's arrangements constituted insufficient minimum contacts. 168 S.W.3d at 784, 794. Likewise, IRA Resources' "contacts" with Texas—agreeing to administer Griego's IRA account, accepting payment for opening the account, and sending Griego periodic account statements—are too inconsequential to support a claim that it purposefully directed its activities here. *See Meader*, 178 S.W.3d at 349 (holding that IRA Resources' services under its contract were not at issue in allegations of TSA violations, so its contacts with Texas were "too random, fortuitous or attenuated" to support specific jurisdiction).

■ Finally, although IRA Resources received some financial benefit from contracting with a Texas resident, this benefit must itself spring from a constitutionally cognizable contact. *Michiana*, 168 S.W.3d at 788. Here, nothing in IRA Resources' actions or contract indicated that purposeful, local availment was intended. *See id.* at 785. In fact, as proof that IRA Resources never intended to avail itself of Texas law, it points to the IRA agreement itself, which stipulates that any disputes would be governed by California law. While a foreign choice-of-law provision does not prevent Texas courts from also exercising personal jurisdiction, the United States Supreme Court has held that a choice-of-law provision cannot be ignored when weighing purposeful availment. *Burger King*, 471 U.S. at 482, 105 S.Ct. 2174. Griego contends that IRA Resources could have structured its contract to avoid jurisdiction in Texas by including a more specific forum-selection clause. This contention rests upon a too-narrow reading of *Michiana*, where we noted a court's duty to consider choice-of-law provisions when determining purposeful availment. 168 S.W.3d at 792 (quoting *Burger*

*King,* 471 U.S. at 482, 105 S.Ct. 2174). Though the IRA agreement here does not require that disputes be litigated in California, this choice-of-law provision, when combined with the fact that Griego initiated contact with IRA Resources, which rendered all of its services within California, demonstrates that IRA Resources never anticipated Texas jurisdiction.

The test is minimum contacts, not *de minimus* contacts, but on this record, Griego would fail even the latter test. In sum, because IRA Resources has not purposefully availed itself of the privilege of conducting activities within Texas, it falls short of the Fourteenth Amendment's minimum-contacts test and is not subject to specific jurisdiction. Our holding today resembles the analysis in the factually similar Fourteenth Court of Appeals' case, *Meader v. IRA Resources, Inc.,* a decision that post-dated the decision of the court of appeals in the instant case. In *Meader,* as here, IRA Resources accepted a $50 account-initiation fee, opened Meader's self-directed IRA, and mailed him periodic account statements, yet that court held as we do: those incidental contacts are constitutionally insufficient. 178 S.W.3d at 345, 349.

There persists one additional issue: whether IRA Resources is subject to *general* jurisdiction. The court of appeals rejected both specific and general jurisdiction as to the other defendants, but it did not reach general jurisdiction for IRA Resources because it found that specific jurisdiction applied. 161 S.W.3d at 256. Because IRA Resources avers that it maintains accounts for twenty-five Texans, we remand to that court for an analysis of general jurisdiction, which the Fourteenth Court of Appeals in *Meader* found was plainly lacking. 178 S.W.3d at 350.

We conclude that IRA Resources' actions do not constitute the "purposeful availment" required to exercise specific jurisdiction. Accordingly, we grant the petition for review and without hearing oral argument, Tex.R.App. P. 59.1, 60.2(d), reverse the court of appeals' judgment and remand to that court to consider Griego's general jurisdiction argument.